**United States District Court**

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHOKAT HAMED | No. C-10-2790 JCS |
| Plaintiff, | **AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |
| v. | |
| MACY'S WEST STORES, INC., | |
| Defendants. / | **[Docket No. 48]** |

**I.      INTRODUCTION**

On Friday, April 8, 2011 at 9:30 a.m., the Defendant Macy's West Stores, Inc.'s ("Defendant") Motion for Summary Judgment ("the Motion") came on for hearing.[1]  At the hearing, the parties requested another opportunity to explore settlement before the Court ruled on the Motion. The Court granted the parties two weeks to explore settlement – a period of time that has now expired.  Having considered the papers and arguments of counsel, and for the reasons stated below, the Motion is GRANTED IN PART AND DENIED IN PART.[2]

---

[1]The parties have consented to the disposition of this case before a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

[2]This order is nearly identical to the one issued by the Court on April 29, 2011, except that at page 26, lines 5-6, the Order is corrected to reflect a clerical error.  The Order is amended to reflect that summary adjudication on the retaliation claim based upon medical condition/disability is GRANTED.

United States District Court

For the Northern District of California

## II.    BACKGROUND

### A.    Facts[3]

Plaintiff Shokat Hamed was born in 1933.  JSUF 1.  She was an employee at Macy's Hillsdale mall store location in San Mateo, California ("Hillsdale"), from 1990 to November 2009, with a break-in-service that began in 1994 (when Plaintiff was laid off at the time Macy's underwent a Chapter 11 restructuring) and ended with her rehire in August 1995.  JSUF 2 (Pl. Dep. 24:10-15; MACYS000272); Declaration of Shokat Hamed ("Hamed Decl.") at ¶ 2.  In August 1995, Plaintiff acknowledged receipt of the "Macy's/Bullock's Employee Handbook. MACYS000089.  JSUF 3.  Plaintiff remained employed by Macy's continuously from 1995 until May 2009.  Hamed Decl., ¶ 2.  In May of 2009, Plaintiff was a full-time sales associate in the Young Men's Department.  JSUF 4.  Goodin Decl. at ¶ 14, Exh. F.  At the time of Plaintiff's termination from Macy's in November 2009, she was 76 years old.  Hamed Decl. at ¶1.

According to Plaintiff, she was an exemplary employee.  Hamed Decl., ¶ 2, Exh. A.  She has submitted evidence that she earned 40 Certificates of Achievement and Employee of the Month Awards during her more than 18 years of work at Macy's.  Id.[4]  According to Plaintiff, this all changed in the summer of 2009 when she asked her employer to accommodate her poor night vision by asking if she could leave work before dark each day.  Id. ¶ 4-6.  Plaintiff declares that she had problems with night vision prior to May of 2009.[5]  Id. ¶ 4.  Plaintiff states that her supervisor, Helen

---

[3]  Unless otherwise indicated, the following facts are taken from the parties' Joint Statement of Undisputed Facts.

[4]Defendant objects to this portion of Plaintiff's declaration on the grounds that this evidence is irrelevant and misleading given that Plaintiff received at least 33 of the 40 commendations for opening new accounts, which Defendant argues is "not surprising" given that she admittedly and improperly used Macy's 11% coupons as incentives to convince customers to open credit accounts.  Defendant's objection goes to the weight of the evidence not its admissibility; the objections to Plaintiff's declaration are OVERRULED.

[5]Defendant objects to this portion of Plaintiff's declaration on the ground that "Hamed is not a physician but is offering medical testimony that she had night vision issues that predated May 2009 – months before Macy's received a note from her physician.  She is not competent to testify to her medical condition or its onset."  Defendant's Objections to Declaration of Shokat Hamed at 3.  The objection is OVERRULED.

**United States District Court**

For the Northern District of California

1    Morales[6], initially refused telling her that it is store policy not to change employees' schedules, and

2    that if she wanted to leave early, she would have to switch shifts with other employees in her

3    department. *Id.* Plaintiff admits that she agreed to this arrangement. *Id.* Plaintiff contends that this

4    arrangement was difficult for her; when the new schedule would come out, she would sometimes

5    have to pay her co-workers in order to convince them to stay late for her, for example, by paying for

6    their dinners. *Id.* Plaintiff states that this arrangement took a toll on her self-esteem because she

7    was forced to constantly ask for favors from her junior co-workers. *Id.* Plaintiff admits that her

8    supervisor Morales told her that she could obtain a doctor's letter and submit it to the store's human

9    resources department. Pl.'s Opp. at 3.

10        What happened next is in dispute: Plaintiff remembers delivering her doctor's note in person

11   to the human resources manager, Christina Goodin[7], and that she had a "face to face" conversation

12   with her. Hamed Decl., ¶ 7. Plaintiff recalls that Goodin told Plaintiff that she did not have a full-

13   time sales position available that did not involve working after dark, and then stated "Shokat, why

14   don't you retire?" *Id.*[8]

15   _____

16   [6]Helen Morales worked for Macy's between 1998 and 2002, part of that time as a Loss
     Prevention Agent. JSUF 5 (Morales Dep. 11:2-13, 22-25; 12:1-8; 29:13-14). Macy's rehired Morales

17   in 2006 at Hillsdale and promoted her to full-time Group Sales Manager ("GSM") of Housewares in
     October 2007 and full-time GSM of Men's Basics, Men's Collections, and Men's Suits in or about April

18   2008. JSUF 6 (Morales Dep. 11:19:20; 14:24-15:14; 33:22-34:7). On May 10, 2009, Morales became
     full-time manager of the Young Men's Department, in addition to her continued responsibilities as

19   manager of Men's Basics, Men's Collections, and Men's Suits. JSUF 7 (Morales Dep. 17:8-11;
     MACYS000278). Morales was Plaintiff's immediate supervisor from May 2009 through Plaintiff's

20   termination in November 2009. JSUF 8 (Morales Decl. at ¶ 17:8-11; Goodin Decl. at ¶ 14, Exh. F).

21   [7]Macy's hired Goodin in July 2002 as a GSM in the Palo Alto store, where she was promoted
     to GSM of Home in about January 2003. JSUF 21 (Goodin Dep. 25:23-26:16). Goodin has been in

22   Human Resources since 2004. JSUF 22 (Goodin Dep. 26:20-27:19). At the time of the events at issue,
     Goodin was the Human Resources Manager ("HRM") for Serramonte, Hillsdale, and Hillsdale Furniture

23   Gallery, the position she holds today. JSUF 23 (Goodin Dep. 27:13-19).

24   [8]Defendant objects to this portion of Hamed's declaration on the ground that it contradicts her
     previously-given sworn deposition testimony. Defendant's Objection to the Declaration of Shokat

25   Hamed at 4. Defendant claims that Plaintiff testified that H.R. Manager Goodin first asked: "Shokat,
     why don't you retire" in a meeting that occurred in November 2009 at which her daughter was present.

26   Now, in opposition to the summary judgment motion, Plaintiff claims that this statement was made to
     her in July 2009 at a meeting with Goodin. Defendant's Objection at 4. The Court has reviewed the

27   excerpts of the deposition testimony submitted by the Defendant, and disagrees with Defendant's

28                                                    3

United States District Court

For the Northern District of California

1   Goodin has a different recollection.  She states in her declaration that the doctor's note was

2   delivered under her door and that she did not have a face-to-face encounter with Plaintiff at that

3   time.  Declaration of Christina Goodin ("Goodin Decl.") at ¶ 13.  Goodin states that she wrote

4   "Received 7/15/09" on the letter.  Goodin then spoke with Plaintiff's supervisor, Ms. Morales and

5   determined that Plaintiff was being accommodated – and had been since May 2009 –  by having

6   Plaintiff work an opening shift instead (if she had been scheduled for a closing shift).  *Id.*  Attached

7   to the Goodin Declaration are the "Clockings and Schedules" report for the summer months in 2009,

8   which demonstrate that "the latest Ms. Hamed clocked out in these late spring and early summer

9   months was between 5:12 and 7:18 p.m."  *Id.*

10   Plaintiff declares that as a result of Morales' and Goodin's decision not to offer her a

11   permanent accommodation, she was required her to trade shifts with her colleagues on her own.

12   Hamed Decl., ¶¶ 4-7.  In her opposition, Plaintiff also states that a review of Goodin's declaration

13   reveals that there were dates that summer when Plaintiff "was forced to endanger herself by

14   disobeying her doctor's orders not to drive after dark. . .  For example, on September 16, 2009, she

15   clocked out at 19:25, which was after sunset. . . . On October 11 and October 18, she clocked out at

16   18:29 and 18:22, which were minutes before sunset but did not leave her time for the evening

17   commute."[9]  Pl.'s Opp. at 3-4 (citing Goodin Decl., ¶ 13, reviewing time records for Plaintiff).

18

---

19   characterization of it.  It is not clear from the transcript that Plaintiff's declaration contradicts her
     previously-given deposition testimony.  The Defendant's objection is OVERRULED.

20

21   [9]Defendant counters that there is no evidence in the record as to what time the sun set during the
     summer or fall of 2009.  Reply at 12-13.  Therefore, Plaintiff's allegation that she drove home in the

22   dark because she clocked out at 18:29 and 18:22 on two different dates is speculation. *Id.* Defendant's
     argument has  some merit.  There is no evidence in the record as to why Plaintiff clocked out at those

23   times on those dates, whether she had a ride home on those evenings from her daughter, or drove herself,
     or whether she had asked (and was denied) to work an earlier shift.  Her declaration is silent as to these

24   specific instances argued by her counsel.  If, for example, Plaintiff had stated in her declaration that she
     recalls specific nights on which she was required to drive home after dark, despite having informed her

25   supervisor of her medical condition, then the evidence provided by Goodin and Morales of the
     accommodations would be refuted.  Defendant presents evidence that the latest Plaintiff "clocked out"

26   in the "late spring and early summer months" was 7:18 p.m. Later in Goodin's declaration, she explains
     that the Clockings and Schedule report attached as Exhibit E establishes that "during the period of time

27   when Morales was Ms. Hamed's manager, Ms. Hamed never clocked out later than 7:33 p.m. (despite
     the fact that the store closes at 9 p.m.). Like Plaintiff's evidence, this evidence is not determinative,

28                                                    4

United States District Court

For the Northern District of California

In September 2009, Plaintiff was a full-time sales associate working a minimum of 30 hours per week over a 4-5 day schedule. JSUF 9 (MACYS000283). On September 19, 2009, the Human Resources office faxed a September 15, 2009 letter from The Permanente Medical Group, Inc. and a Leave of Absence form, signed by Plaintiff on September 16, 2009, to Human Resources Services (HRS). JSUF 10 (Goodin Decl. at ¶ 15, Exh. H). In a letter dated September 26, 2009, Macy's HR Services Leave of Absence Team advised Plaintiff that it had been notified of her request for a leave of absence from September 19, 2009 to September 29, 2009, and the letter stated: "You are eligible for leave under the FMLA/CFRA and the requested leave will be counted against your annual FMLA leave entitlement." JSUF 11 (Goodin Decl. at ¶ 16, Exh. I (MACYS000033-045)). Plaintiff requested a 10-day medical leave in order to have cataract surgery. Hamed Decl., ¶ 8. Plaintiff states that her employer treated this medical leave as vacation time, rather than sick leave (but provides nothing to support this belief). *Id.* Plaintiff returned from a medical leave of absence on September 30, 2009. JSUF 12 (Goodin Decl. at ¶ 16, Exh. J (MACYS000282)).

A few months after Ms. Morales and Plaintiff met to discuss the night vision problems, Morales states that she received complaints from several employees in her departments (Young Men's and Men's Basics) that Plaintiff was not "carrying her weight" with respect to "go backs" (merchandise that has to be returned to the selling floor). Morales Decl., ¶ 10.[10] Morales observed that Plaintiff was not always able to complete a "go-back rack" during her shift, which was the expectation of employees in this department. *Id.* There were other employee complaints about Plaintiff's work (*e.g.*, putting the wrong merchandise out on the selling floor), which increased the other employees' workloads. *Id.* at ¶ 11. Ms. Morales discussed these complaints with the Human

especially without the benefit of knowing the length of Plaintiff's commute, or what time the sun set on those evenings.

[10] Plaintiff objects to the inclusion of the complaints from other employees to Morales under FRE 802. Plaintiff's Objections to Evidence 2 and 3. The Court OVERRULES this objection. Morales' testimony as to the statements made to her by other employees about "go backs" is not offered for the truth of the matter asserted, but rather to show Morales' state of mind with respect to subsequent action she took regarding the transfer of Plaintiff.

1    Resources manager, Christina Goodin, stating that she believed that Plaintiff would do better in a

2    less demanding area of the store, with fewer go-backs.  *Id.* at ¶ 12.

3        In late September, Plaintiff met with her manager, Morales, who told her that she was being

4    transferred from Young Men's Department to the Men's Basics Department.  Hamed Decl., ¶ 9.

5    Morales remembers the incident differently, stating that she asked Plaintiff if she would like to

6    transfer, due to the fact that she seemed to be struggling with go-backs.  Morales Decl., ¶ 13.

7    Morales told Plaintiff that the Men's Basics department is a lighter workload with fewer go-backs.

8    *Id.*  Morales told Plaintiff that she would retain the same schedule and that she could have the

9    position if she wanted it.  *Id.*  Morales recalls that Plaintiff said that a lot of go-backs were hard for

10   her and that sometimes her hands would hurt.  *Id*. at ¶ 14.  Morales states that under company rules,

11   she "cannot insist that the associate transfer."  *Id.*  Rather, the employee has to agree to it before a

12   department transfer can be accomplished.  *Id.*  Morales handed Plaintiff the transfer form after she

13   agreed to it; Plaintiff signed the form and "never expressed any displeasure with the transfer from

14   Young Men's to Men's Basics."  *Id*. at ¶ 16.

15       Plaintiff states in her declaration that she was not happy with the transfer, that she felt like

16   she had no real choice, and states that she had not requested it.  Hamed Decl., ¶ 9.  Plaintiff does not

17   say in her declaration whether she *communicated* any of her displeasure with Ms. Morales.

18   According to Plaintiff, Morales told Plaintiff that the "young people" should do the fitting room

19   work because it was too hard for Plaintiff.  *Id.*  Plaintiff was unhappy with the transfer because

20   "Men's Basics felt like a less desirable position to [her] than Young Men's because [she] gained

21   more satisfaction from selling shirts and slacks than from selling 'basics' like socks and underwear."

22   *Id.*

23       Despite her disagreement with the transfer, it is undisputed that Plaintiff signed and dated an

24   "Associate Transfer Approval" form on September 30, 2009.  JSUF 13 (Goodin Decl. at ¶ 14, Exh. F

25   (MACYS000060)); Hamed Decl.,¶ 9.  Plaintiff was transferred from Young Men's to an open

26   position in Men's Basics on or about October 11, 2009.  JSUF 14 (Goodin Decl. at ¶ 14, Exh. F

27

28                                                     6

(MACYS000060); MACYS000281).  Plaintiff's transfer from Young Men's to Men's Basics did not result in a decrease in hours or a decrease in hourly rate of pay.  JSUF 15 (Goodin Decl. at ¶ 14; MACYS000281).  Morales continued to be Plaintiff's supervisor after the transfer from Young Men's to Men's Basics. JSUF 16 (Goodin Decl. at ¶ 14, Exh. G (MACYS000275)).

On October 5, 2009, Plaintiff and her daughter Showle Khalessie attended a meeting with the Human Resources manager, Tina Goodin.  Hamed Decl., at ¶ 10.  Plaintiff explained to Ms. Goodin that it was very hard for her to manage her schedule under the current arrangement whereby she has to do her own shift trades; Plaintiff requested a more permanent accommodation for her night vision problems.  *Id.*  At that meeting, according to Plaintiff, Goodin asked Plaintiff her age, and when Plaintiff answered that she was 76, Goodin replied "Wow, I didn't know you were that old" and said, for the second time, "Shokat, you should retire."  *Id.*  Plaintiff and her daughter pointed out that some employees were leaving the store at 4:00 or 4:30 p.m. and Ms. Goodin responded that those workers had family medical leave, and asked Plaintiff if she wanted to apply for it.  *Id.* at ¶ 11. Plaintiff responded that yes, she wanted to apply for it, and also told Goodin that she loved her job and did not want to retire.  *Id.*

In late September or early October 2009, Morales states that she received at least two complaints from Plaintiff's co-workers that Plaintiff was giving out unauthorized coupons.   Morales Decl., ¶ 20.  Morales also states that on two occasions, customers complained to her about Plaintiff's actions with respect to opening credit accounts.  One customer complained that Plaintiff had asked for his credit card and driver's license and opened a Macy's credit account without his knowledge.  *Id.*, ¶ 17.  Another customer complained that Plaintiff had attempted to open a credit account and had been very persistent and aggressive; the customer refused.  *Id.*[11]

On Sunday October 11, 2009, Plaintiff's manager Helen Morales held a department meeting.

---

[11]Plaintiff objects to Morales' declaration to the extent it includes out of court complaints from customers under FRE 802.  The Court OVERRULES this objection.  These statements are not offered for the truth of the matter asserted, but rather, they are offered to show Morales' state of mind and motivation with respect to the subsequent actions she took in reporting Plaintiff to the Loss Prevention Department.

JSUF 17 (Morales Decl. at ¶ 21; Exh. B (MACYS000823-824)).  Plaintiff's "Attendance Record"

for Sunday, October 11, 2009, indicates a scheduled start time of 10:45 a.m. and a clock-in time of

9:30 a.m.  JSUF 18 (Goodin Decl. at ¶ 49, Exh. E (MACYS000786)).  Sales associates' schedules

are generated by a computer program managed by Macy's Staffing division. JSUF 19 (Goodin Dep.

75:6-13).   Plaintiff has no memory of attending the October 11 meeting where the coupon rules

were discussed, and states that if she had attended such a meeting, she would remember it.  Hamed

Decl., ¶ 12.

    In late October 2009, Plaintiff requested a schedule of "open until 5 p.m." and submitted the

necessary "Leave of Absence" form (attached to the Goodin Declaration as Exhibit K), which was

required in order to qualify for intermittent FMLA leave.  Plaintiff's request for intermittent FMLA

leave in connection with her request not to work past 5 p.m. was granted.  JSUF 20 (Goodin Decl. at

¶ 18, Exh. K (MACYS000105-109)).  Macy's approved Plaintiff for intermittent FMLA leave with a

beginning date of October 20, 2009, and an ending date of October 19, 2010.  JSUF 24 (Goodin

Decl. at ¶ 20, Exh. L (MACYS000779).

    Based upon complaints both before and after the October 11 department meeting, Plaintiff's

Manager reported her concerns that Plaintiff was giving unauthorized discounts to customers to the

Loss Prevention Department.  Loss Prevention Manager Joseph Dunnam[12] conducted an

investigation of Plaintiff.   Morales Decl., ¶ 23.  Morales reported to Loss Prevention that she

suspected that Plaintiff was using the red coupons that Macy's credit card holders receive in the mail

because those were the coupons that Morales had found around the cash registers.  *Id.*  Dunnam's

---

[12]Excluding earlier summer employment with the company, Macy's hired Loss Prevention
Manager Joseph Dunnam in or about November 2000. Dunnam Dep. JSUF 26 (13:16-14:7). Dunnam
began working for Loss Prevention in or about February 2001, first part-time and then full-time as a
Loss Prevention Agent, Senior Loss Prevention Agent, Assistant Loss Prevention Manager, and Loss
Prevention Manager (the position he held at the time of the events at issue and holds today),
respectively. JSUF 27 (Dunnam Dep. 14:20-16:4; 18:15-19:15). The external loss prevention program
is the process of apprehending shoplifters; the internal loss prevention program is the process of
conducting internal investigations, which relate to dishonest activity by employees; and the loss
prevention process is the programs Macy's has in place to deter shoplifting.  JSUF 28 (Dunnam Dep.
20:7-18).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

investigation revealed that Plaintiff was misusing the 11% "Visitor Coupons", not the red coupons. The "Welcome Savings Pass" is distributed to guests at participating hotels and conventions; the Macy's "International Savings Card" is distributed by tour operators and travel agents. These items are collectively referred to as "Visitor's Coupon" "Savings Pass" and "Welcome Pass." Goodin Decl., ¶ 21. The Visitor's Coupon provided out-of-town visitors with an 11% discount on their purchases. *Id.* The Macy's policy with respect to the Visitor's Coupon states: "Only those customers who present a Visitor Services savings pass/card are to receive the discount. These savings passes are not to be kept at the registers and never offered to customers by associates on the selling floor or at a POS [point of sale]." Goodin Decl., ¶ 21, Exh. M.

As part of the Loss Prevention investigation, Dunnam reviewed discount reports, an electronic roll of journal transactions, and video footage. JSUF 29 (Dunnam Dep. 56:2-7). According to Dunnam, he found a number of 11% discounts in Plaintiff's transactions. Declaration of Joseph Dunnam, ¶ 10. Dunnam matched the time stamp on the register transactions to the time stamp on the video footage in order to confirm that Plaintiff had been providing customers with the 11% discount Visitor's Coupon in connection with the opening or the attempt to open a Macy's credit card account. *Id.* ¶¶ 15-19, Exh. A (video and CD). The video showed Plaintiff pulling a coupon from her pocket and scanning it. *Id.* In several transactions, Plaintiff voided a sale and then processed a credit card application for a customer. *Id.* In each instance, the credit card was declined, and Plaintiff rang the same merchandise and gave the customer an 11% discount. *Id.*

In the parties' joint statement of undisputed facts, the parties agree on the following transactions: The transaction conducted by Plaintiff and completed at 11:44 AM on 10/05/2009 indicates the cancellation of a $30.00 "IZOD MENS" item. JSUF 30 (Dunnam Decl. at ¶ 17, Exh. A (MACYS000858)). The transaction conducted by Plaintiff and completed at 11:48 AM on 10/05/2009 indicates the attempt to open a Macy's credit card, which was declined. JSUF 31 (Dunnam Decl. at ¶ 17,Exh. A (MACYS000857)). The transaction conducted by Plaintiff and completed at 3:00 PM on 10/15/2009 indicates the cancellation of the purchase of a "MENS

United States District Court

For the Northern District of California

1   LEATHER" item.  JSUF 32 (Dunnam Decl. at ¶ 18, Exh. A (MACYS000859)).  The transaction

2   conducted by Plaintiff and completed at 3:04 PM on 10/15/2009 indicates the attempt to open a

3   Macy's credit card, which was declined.  JSUF 33 (Dunnam Decl. at ¶ 18, Exh. A

4   (MACYS000860)).

5       Pursuant to Macy's Loss Prevention Policy, Dunnam contacted a "District Special

6   Investigations Unit Manager" and informed him of the video and register transactions involving

7   Plaintiff.  Dunnam Decl., ¶ 22.  The Special Investigations Manager authorized Dunnam to interview

8   Plaintiff.  *Id.*  Before Dunnam interviewed Plaintiff as part of the Loss Prevention investigation, he

9   contacted Goodin to ask whether there was any reason not to proceed due to Plaintiff's age. JSUF 34

10  (Goodin Dep. 100:13-20; 103:14-23).  Goodin told Dunnam that she would check with her manager,

11  District Director of Human Resources Brenda Moore ("Moore")[13].  JSUF 35 (Goodin Dep. 40:7-12;

12  100:21-23; Moore Dep. 23:21-24).  Moore told Goodin that there was no reason not to proceed with

13  the interview of Plaintiff.  JSUF 37 (Goodin Dep. 101:7).  Goodin told Dunnam to interview

14  Plaintiff.  JSUF 38 (Goodin Dep. 117:14-20).

15      Dunnam interviewed Plaintiff on October 27, 2009. JSUF 39 (Dunnam Decl. at ¶ 23;

16  MACYS000240).  Goodin's role is to review the evidence presented by Loss Prevention (*e.g.*,

17  investigation report, associate statement, transactions, video), interpret the facts, and make an

18  employment decision.  JSUF 43 (Goodin Dep. 121:4-12; 121:18-25).

19      After Goodin reviewed the Loss Prevention file, and before the date of Plaintiff's

20  termination, Goodin spoke to Moore to summarize the matter and make her recommendation.  JSUF

21  45 (Goodin Dep. 127:25-128:24).  Goodin partnered with Moore because Plaintiff had more than

22  two years of service with Macy's.  JSUF 46 (Goodin Dep. 130:1-5; Moore Dep. 98:17-20).  Goodin

23  states that she recommended to Moore that Plaintiff's employment be terminated because Plaintiff's

24  multiple violations of the coupon policy caused a loss to the company and resulted in personal

25

26      [13]Macy's hired Moore in May 1986, she began working full-time for Macy's in 1989, and she

27  has been in Human Resources since 1999.  JSUF 36 (Moore Dep. 21:22-23; 22:10-12; 23:11-12).

28                                                        10

financial gain for Plaintiff.  Goodin Decl., ¶¶ 37-41.  Goodin recommended to Moore that Plaintiff's employment be terminated.  JSUF 47 (Goodin Dep. 129:10-11).  Moore was required to obtain approval from a Vice President because Plaintiff had more than five (5) years of service.  JSUF 48 (Moore Dep. 99:3-15).

According to Plaintiff, she was brought in to "Joe" in the Loss Prevention Department without any warning.  Hamed Decl., ¶ 13.  Plaintiff told him that she had given the 11% coupon to customers, and that she did not know it was wrong to do so.  *Id.*  She told Joe that she was "trying to help Macy's by keeping the customer happy; and that [she] would not do it again."  *Id.*

Dunnam confirms that Plaintiff admitted her misuse of the 11% Visitor's Coupon discount, and states that she admitted that she kept the coupon in her pocket and said she was sorry and would not do it again.  Dunnam Decl., ¶ 25.

Dunnam suspended Plaintiff's employment on October 27, 2009.  JSUF 40 (Dunnam Decl. at ¶ 26 (MACYS000867)).  He advised her to return to the store on November 4, 2009 to meet with Human Resources.  *Id.* at ¶ 26.  Plaintiff states that this suspension was without pay.  Hamed Decl., ¶ 13.  The "Notification of Suspension" form provided to Plaintiff by Dunnam advised Plaintiff to return on November 4, 2009, and report to Goodin in the Human Resources office.  JSUF 41 (MACYS000867).  Loss Prevention then provided an investigation report to Goodin after the date of Plaintiff's suspension. JSUF 42 (Goodin Dep. 120:20-121:3.43).  Goodin states that she was not involved in the Loss Prevention Investigation.  Goodin Decl., ¶ 34.

Plaintiff arrived at the November 4, 2009 meeting with her daughter, Showle Khalessi.  JSUF 49 (Goodin Dep. 143:17-19; 145:3-5).  Plaintiff asked Goodin if Khalessi could sit in on the November 4, 2009 meeting, which Goodin allowed.  JSUF 50 (Goodin Dep. 146:16-17).  During the November 4, 2009 meeting, Goodin talked with Plaintiff about the Loss Prevention investigation.  JSUF 51 (Goodin Dep. 146:17-19).  Also during this meeting, Khalessi provided Goodin with a one-page typewritten document drafted by Khalessi.  JSUF 52 (SH 00129).  Goodin states that she did not believe Plaintiff's statements regarding her good intentions, or her statement that she tried to

11

United States District Court

For the Northern District of California

make angry customers happy by giving them the 11% discounts.  Goodin Decl., ¶ 48.  Goodin did not believe that Plaintiff was unaware of Macy's policies with respect to coupons, given the number of years Plaintiff had worked for the company.  Id. at ¶ 24, 48.  Goodin terminated Plaintiff's employment during the November 4, 2009 meeting.  JSUF 53 (Pl. Dep. 120:6-14).

The Plaintiff does not dispute that she gave some of her customers the 11% discount if they applied for a Macy's credit card.  JSUF 54 (Pl. Dep. 62:14-18).  Plaintiff argues that she was doing so not out of personal financial gain (*i.e.*, to obtain the cash reward for opening new accounts) but in order to make the customers happy and help Macy's in the longer term by creating customer loyalty.  Plaintiff states: "I never knew it was wrong to give the 11% discount coupon.  In fact I remember once I told the store manager I did this and he said to me: Great going Shokat!  Keep the customer happy!"  Hamed Decl., ¶ 16.  Plaintiff also states that she was never warned that it was wrong to give the 11% coupon to customers in order to encourage them to open new accounts.  She states further:  "If only once my supervisor had talked to me and told me I was doing anything wrong by giving the discount coupon, I would have stopped immediately.  As it was, I thought I was doing a good thing for Macy's – increasing sales, increasing customer loyalty, and most of all, 'keeping the customer happy.'"  *Id.*

Defendant has provided evidence in the form of its store policies, including the specific policy related to the 11% discount coupon, indicating that it is a clear violation of store policies to offer the coupon to customers without certain pre-requisites.  *See* Goodin Decl., Exh. M (Welcome Savings Pass" policy, including 11% "Visitor's Coupons").  Specifically, the policy states: "Only those customers who present a Visitor Services savings pass/card are to receive a discount.  These savings passes are not to be kept at the registers and never offered to customers by associates on the selling floor or at POS [point of sale].  Sales associates are not allowed to refer a customer to the [Gift Wrap department], or disclose the visitor savings pass or card at POS, *unless* the customer specifically inquires about the visitor discount." *Id*. (emphasis in policy).  Defendant has also provided evidence that all employees are trained in store policies, including at "morning rallies" in

12

"Training Alerts" and in handouts (*see e.g.*, the Training Alert for the Visitors Coupon attached as Exhibit M).  Goodin Decl., ¶ 23.  Goodin also states that she "is not aware of any manager who has ever communicated a message to any sales associate that he or she could offer any coupon, including the 11% Visitors Coupon, as an inventive to open a Macy's credit card account."  *Id*. ¶ 25. Defendant has also attached as exhibits to the Goodin Declaration, copies of Macy's store policies related to theft and "shortage" (meaning, various losses to the company).  *See* Goodin Decl ¶¶ 29-31 ("Improper handling of coupons is a violation of associate Standards of Conduct and may result in disciplinary action up to and including termination."  *Id*. ¶ 30, Exh. A (MACYS000727)).

Defendant has provided evidence from its Loss Prevention Investigation that Plaintiff kept 11% coupons in her pocket and at the registers where she worked.  She would take these coupons out herself and offer them to the customers, rather than accept them from customers as required by the store's coupon policy.  Although the parties agree that the actual losses to the store were $45.00, Defendant has proffered evidence that termination is a possible consequence of any violation of the store's policies related to loss, theft or shortage.  Goodin Decl., ¶¶ 29-31.

Plaintiff filed a Complaint for Damages against Macy's West Stores, Inc. and Does 1-50 on May 21, 2010, attaching a copy of the Complaint of Discrimination she filed with the California Department of Fair Employment and Housing on or about February 21, 2010.  *See* Notice of Removal, Docket No. 1.

## B.  Procedural History

On May 21, 2010, Plaintiff filed a complaint in state court alleging the following claims:  1) employment discrimination based on physical disability/medical condition, in violation of the Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940 *et. seq.*; 2) employment discrimination based on age in violation of FEHA, Cal. Gov. Code § 12940 *et seq.*; 3) employment discrimination on the basis of national origin in violation of FEHA, Cal. Gov. Code § 12940 *et seq.*, 4)  retaliation in violation of FEHA, § 12945.2; and 5) wrongful termination in violation of public

1  policy based on FEHA and CFRA.  Plaintiff sought compensatory and punitive damages, attorneys'

2  fees and interest.  Defendant removed the action to this court on June 25, 2010.

3        On March 4, 2011, Defendant filed its Summary Judgment Motion.  Plaintiff opposes the

4  Summary Judgment Motion.

5        **C.    The Motions**

6        Defendant asserts in its Summary Judgment Motion that all of the claims alleged in

7  Plaintiff's original complaint fail as a matter of law.  Defendant argues that, even assuming Plaintiff

8  has made a prima facie showing of discrimination, she cannot prevail as a matter of law because

9  Defendant has a legitimate, non-discriminatory reason for terminating Plaintiff's employment – for

10  repeated violations of Macy's coupon policy – and Plaintiff has not come forth with specific,

11  probative evidence of pretext.  Finally, Defendant asserts that the claim for wrongful termination in

12  violation of public policy fails because it is based on the discrimination and retaliation claims.

13        In her Opposition, Plaintiff argues that she has come forward with sufficient evidence that

14  Defendant's stated reason for her termination was a pretext for age and disability discrimination and

15  that Defendant failed to accommodate her disability.  Plaintiff concedes, however, that she has no

16  evidence to defeat summary judgment with respect to the national origin discrimination claim.

17  Plaintiff also argues that Defendant has not moved for summary adjudication on Plaintiff's disability

18  discrimination claim based on failure to accommodate Plaintiff's medical condition/disability.

19  Defendant responds in its reply brief that it has moved for summary judgment on all issues in the

20  case.

21  **III.    ANALYSIS**

22        **A.    The Summary Judgment Motion**

23        Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

24  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

25  any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P.

26  56(c).  In order to prevail, a party moving for summary judgment must show the absence of a

27

28                                         14

genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 411 U.S. 242, 255(1986).

**B.** **Discrimination Claims Based on Disability/Medical Condition, Age and National Origin (Claims 1, 2 and 3) (FEHA) as a Result of Plaintiff's Termination**

Defendant asserts that Plaintiff's disability, age and national original discrimination claims under FEHA fail because even accepting that she has made out a prima facie case of discrimination, she has not presented substantial and probative evidence of pretext in the face of the legitimate, non-discriminatory reasons offered by Defendant for Plaintiff's termination. The Court disagrees in part. Based on the evidence offered by Plaintiff, a reasonable jury could conclude that she was terminated based upon her age. However, there is no evidence in the record from which a jury could conclude that Plaintiff was discriminated against based upon her disability. Further, Plaintiff does not oppose summary judgment with respect to her national origin claim. Because there is no evidence in the record of discrimination on the basis of Plaintiff's nationality, and due to Plaintiff's non-opposition, the Defendant's motion with respect to a national origin claim is GRANTED. The Plaintiff's age and medical disability claims will be addressed below.

*1.* *Discrimination Under FEHA – Legal Standard*

It is unlawful, under FEHA, for an employer "because of . . . national origin . . . physical disability . . . medical condition  . . . age, . . . to discharge the person from employment . . . or to

United States District Court

For the Northern District of California

1    discriminate against the person in compensation or in terms, conditions, or privileges of

2    employment." Cal. Gov. Code § 12940(a).  California courts consider FEHA claims to be analogous

3    to discrimination claims brought under Title VII and apply the burden-shifting framework developed

4    by federal courts to address such claims. *See Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000).

5         Under that framework, the plaintiff must first establish a prima facie case of discrimination.

6    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  For the purposes of summary

7    judgment, a prima facie case requires the plaintiff to "produc[e] enough evidence to permit the trier

8    of fact to infer the fact at issue." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n. 7

9    (1981).  The burden of proving a prima facie case is "not onerous." *Id.* at 253.  Once a plaintiff has

10   established a prima facie case, the burden shifts to the employer to produce some evidence that it

11   had legitimate, nondiscriminatory reasons for the employment decision. *Watson v. Fort Worth Bank*

12   *& Trust*, 487 U.S. 977, 985 (1988).  Once an employer has produced such evidence, the plaintiff can

13   survive summary judgment only by providing "significant, substantial evidence of pretext." *Steckl*

14   *v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).

15        To make a prima facie case of discrimination based on national origin or age discrimination,

16   Plaintiff must show that (1) she was in a protected class, (2) she was qualified for the position, (3)

17   she was subject to an adverse employment action, and (4) some other circumstance suggests

18   discriminatory motive. *See Guz,* 24 Cal.4th at 354-55; *see also Nidds v. Schindler Elevator Corp.*,

19   113 F.3d 912, 917 (9th Cir. 1996).  Even where the fourth element is not met, a prima facie case may

20   be made where "the plaintiff show[s] through circumstantial, statistical, or direct evidence that the

21   discharge occurred under circumstances giving rise to an inference of . . . discrimination." *Id.*

22   (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990).

23        While the *McDonnell Douglas* analysis discussed above applies equally to disability

24   discrimination claims, the prima facie analysis is somewhat different.  In order to establish a prima

25   facie case of disability discrimination, a Plaintiff must show that (1) she suffers from a disability, 2)

26   she can perform the essential functions of her job with or without reasonable accommodations, and

27

28                                                        16

**United States District Court**
For the Northern District of California

3) she was subjected to an adverse employment action because of this disability. *Harris v. United Parcel Service, Inc*., 2009 WL 1916930 (N.D. Cal., July 1, 2009) citing *Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 254-55, 102 Cal.Rptr.2d 55 (2000).

> 2.    *Application of the Law to the Facts of the Case– Prima Facie Case*

The Court finds that Plaintiff has satisfied the elements listed above for a prima facie case of age discrimination and discrimination based upon disability or medical condition.  In particular, she has presented evidence that she was over 40 years of age at the time of her termination (she was 76), she was qualified for her position and performing it satisfactorily (with 18 years of service) before the events leading up to her termination, and that some other evidence suggests that she was discharged from her employment with Macy's on account of the discrimination.  Regarding her age claim, Plaintiff has presented evidence of three comments, two from the H.R. Manager Goodin suggesting that Plaintiff retire, and one from her manager asking about her age, telling her that the work in the Young Men's Department should be performed by the "young employees."  With respect to the discriminatory motive or intent portion of the prima facie case, the Court finds that Plaintiff has made the required prima facie case.

With respect to the disability claim, Plaintiff has also put forward evidence that she had difficulties with her vision at night and that she could perform the essential functions of her job with reasonable accommodation.  Regarding Plaintiff's medical condition or disability, Defendant has put forth evidence, and it is undisputed, that Macy's found an accommodation that was approved by the Defendant's "Leave of Absence Team."  Plaintiff has put forth some weak evidence that any adverse employment action occurred *on account of* her medical condition or disability.  For purposes of the minimal showing required for a prima facie case, the Court finds that the timing of events is sufficient for Plaintiff to meet this low burden.  That is, the fact that Plaintiff was not investigated for the alleged violation of the coupon policy until *after* Plaintiff's repeated requests for accommodation due to her night vision problems, constitute sufficient evidence to proceed to the second part of the *McDonnell Douglas* analysis.

17

United States District Court

For the Northern District of California

3.      *Plaintiff Rebuts Defendant's Proffered Nondiscriminatory Reason*

In opposition, Defendant responds to Plaintiff's prima facie showing by producing evidence that it terminated Plaintiff for a nondiscriminatory reason: Plaintiff was terminated for repeated violations of Macy's coupon policy by giving customers discounts as inducements to persuade them to apply for Macy's credit accounts (and thus allowing Plaintiff to collect cash awards each time a customer tried to open an account), which resulted in losses (of approximately $45) to the company. With respect to the transfer to the Men's Basic Department, Defendant has provided evidence that this transfer was made in order to accommodate Plaintiff, who had been unable to satisfactorily fulfill her job duties in her original department, and that this transfer resulted in no change in hours or pay and cannot be considered an adverse employment action.  Because Defendant has presented evidence of a legitimate non-discriminatory reason for termination, the burden shifts to back to the Plaintiff to present substantial evidence of pretext.  The Court concludes that she has done so only with respect to her age discrimination claim.

"A plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 849 (9th Cir. 2004) (citations omitted). The level of showing required at the pretext stage has been the source of some confusion.  For example, the Ninth Circuit has stated that a plaintiff "need produce very little evidence of discriminatory motive to raise a genuine issue of material fact."  *See Lindahl v. Air France,* 930 F.2d 1434, 1438 (9th Cir. 1991); *see also, Strother v. Southern Cal. Permanente Med. Group*, 79 F.3d 859, 870 (9th Cir. 1996) (quoting *Lindahl*).  Yet, the Ninth Circuit has also held that a plaintiff must produce "specific, substantial evidence of pretext" in order to overcome the defendant's showing of its stated nondiscriminatory reason for its adverse employment action.  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).  The Ninth Circuit has explained that these "differing

standards. . . are reconcilable, for they depend upon the nature of the plaintiff's evidence." *Godwin*

*v. Hunt Wesson, Inc*., 150 F.3d 1217, 1221 (9th Cir. 1998).  In *Godwin,* the Ninth Circuit held that

> When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.  As we said in *Lindahl*, it need be "very little." *Lindahl*, 930 F.2d at 1438 (direct evidence of sexual stereotyping where employer believed that the female candidates get 'nervous' and 'easily upset.') . . . Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." (internal quotation and citations omitted)

150 F.3d at 1221.

Plaintiff's evidence of discriminatory intent with respect to age consists of three remarks, one from her supervisor, informing her at the time of her transfer to a different department within Macy's (with the same pay and schedule) that the "young employees" should do the work in the Young Men's Department, and two comments from Human Resources Manager Goodin asking Plaintiff if she were planning to retire and suggesting that Plaintiff retire, including the statement "Wow, I didn't realize you were that old."

With respect to the first comment – from Plaintiff's supervisor, Morales, that "young people" should do the fitting room work because it was too hard for Plaintiff, the Court agrees that this comment is, on its face, discriminatory.  The Defendant argues that this isolated comment is a "stray remark."  The Court disagrees.  Although Defendant is correct that the evidence shows that once Morales reported her suspicions regarding Plaintiff's violations of the coupon policy to the Loss Prevention Department, she had nothing more to do with the investigation and decision to terminate Plaintiff, the law is clear in the Ninth Circuit that if a manager influenced or had any involvement in the decision to terminate, the remark cannot be considered a "stray remark."  *See Dominguez-Curry v. Nevada Transp. Dep't.*, 424 F.3d 1027, 1029 (9th Cir. 2005).  Therefore, the comment by Morales provides evidence of discriminatory animus and could be found to have been the motivation behind Morales' decision to refer Plaintiff for investigation, which lead to her ultimate termination.

In *Dominguez*, the Ninth Circuit reversed a district court's decision to grant summary judgment for the employer where the court had found that the individual who uttered the

19

discriminatory remark at issue remark was not "sufficiently involved in the hiring decision." The Ninth Circuit reversed, holding that the manager's discriminatory comment could not be considered a "stray remark." *Dominguez-Curry*, 424 at 1039. The court distinguished an earlier decision of the court, explaining: "Where, as here, the person who exhibited discriminatory animus *influenced* or participated in the decision making process, a reasonable factfinder could conclude that the animus affected the employment decision." *Id.* (emphasis added). The court also explained: "[I]n this circuit, *we have repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer*." *Id.* at 1029 (citations omitted) (emphasis added).

Here, Defendant argues that Morales was not involved in the decision to terminate Plaintiff after she reported her suspicions of Plaintiff to human resources. However, in light of the Ninth Circuit's decision in *Dominguez-Curry* (and the cases cited therein), the Court cannot conclude that Ms. Morales's comment is a "stray remark" given that: 1) it was uttered by Plaintiff's own supervisor and 2) Plaintiff's supervisor had some "influence" in the decision to terminate Plaintiff (she initiated the investigation of Plaintiff).

With respect to the comments made by H.R Manager, Goodin, asking or suggesting that Plaintiff retire, the Court finds that these comments constitute evidence of discriminatory animus. Although they are not evidence, "which if believed, proves the fact without inference or presumption" (*Godwin*, 150 F.3d at 1221(citation omitted)), they constitute circumstantial evidence of discrimination. The Court finds that the statement of an HR Manager: "Wow, I didn't know you were that old. . . You should retire" constitutes circumstantial evidence of discriminatory animus. While the Defendant may argue that there is nothing facially discriminatory about an HR Manager discussing retirement as a possibility for someone of retirement age, the context in which these comments were made does not support Defendant's position. The remarks, accepted as true for purposes of summary judgment, were made by the HR Manager without prompting by Plaintiff and were not part of a larger discussion about Plaintiff's retirement or career options with Macy's. A

20

United States District Court

For the Northern District of California

1   reasonable trier of fact could find that these statements were made with discriminatory intent,

2   particularly given that Ms. Goodin was directly involved in the decision to terminate Plaintiff.

3          The Court finds that Plaintiff has come forward with both direct and circumstantial evidence

4   that shows that the employer's proffered reasons were not the actual motives. *Godwin*, 150 F.3d at

5   1222. Here, the statement of Morales is direct evidence of discriminatory animus; while the

6   statements by Goodin can best be characterized as circumstantial evidence.

7          In summary, the evidence proffered by Plaintiff of discriminatory intent with respect to age is

8   as follows: 1) a discriminatory comment from Plaintiff's manager Morales at the time of her transfer

9   to a different department that the "young" employees should do the heavier work in the Young

10  Men's department; and 2) the H.R. Manager's statements that Plaintiff should retire. The Court

11  concludes that these actions constitute the sort of specific evidence of discriminatory motive (with

12  respect to age) sufficient to overcome Defendant's proffered reason for terminating Plaintiff – her

13  repeated violation of the company's coupon policy. Taken together, this evidence of pretext is

14  sufficient to defeat Defendant's summary judgment motion. However, for the reasons discussed

15  more fully below with respect to the retaliation claim, there is not enough evidence to show

16  discriminatory animus on the basis of disability. *See infra* Section D. Plaintiff has not produced

17  sufficient evidence of pretext sufficient to overcome Defendant's stated nondiscriminatory reason

18  for Plaintiff's termination.

19         Accordingly, summary judgment as to Plaintiff's age discrimination claim is DENIED;

20  summary judgment as to the national origin and disability discrimination claims is GRANTED.

21  **C.     There Are Genuine Issues of Material Fact Regarding Whether Defendant
          Provided Reasonable Accommodations for Plaintiff's Night Vision Difficulties**

22

23         With respect to Plaintiff's claim based upon disability discrimination as a result of

24  Defendant's failure to accommodate Plaintiff's night vision problems, the Court finds that there are

25  disputed facts that preclude summary judgment on this issue.

26

27

28                                                  21

Defendant has provided evidence from Plaintiff's supervisor Morales, which demonstrates that Defendant provided accommodations to Plaintiff for her night vision disability. Initially, Ms. Morales states that Plaintiff asked if her schedule could be altered so that she would not have to work late shifts. Morales Decl., ¶ 9.[14] According to the Defendant, Plaintiff did not provide a reason for the request. *Id.* Ms. Morales told Plaintiff (as she tells all employees who want to alter their schedules) that she needed to switch schedules with another employee if she wanted to have a different schedule. *Id.* Approximately one week later, Plaintiff informed her manager that she could not see at night. *Id.* Ms. Morales states in her declaration that she told Plaintiff that she had to submit a doctor's note to Human Resources, and states that she agreed to do what she could to help. *Id.* Morales states that subsequent to that conversation, she changed Plaintiff's work schedule every week. *Id.* Ms. Morales would view the computer-generated work-schedule, and then ask an associate of he or she would mind switching an opening shift for Plaintiff's closing shift. *Id.* If it "slipped [her] mind to alter the schedule. . . [she] would just tell Ms. Hamed to come in early on the days she was scheduled to work late. She was not required to work until closing." *Id.*

Plaintiff disputes Morales' version of events, and states in her declaration in opposition to Defendant's motion that the onus was on *her* to work out shift changes with her co-workers during the summer of 2009, and that this was an unsatisfactory solution to the problem. Hamed Decl., ¶¶ 5-6. She would have preferred to have had her schedule permanently changed so that she would never be scheduled to work after dark. *Id.* Plaintiff states: "After I told Ms. Morales about my night vision problems, she continued to give me a schedule that required me to stay until closing time some nights. She told me that in order to avoid working a closing shift, I had to arrange a 'shift trade' each time with another sales associate. *Id.* at ¶5.

Plaintiff cites *Livingston v. Fred Meyer Stores, Inc*. 2010 WL 2853172 (9th Cir 2010), for the proposition that employers have a duty to reasonably accommodate an employee's night vision

---

[14]Plaintiff objects to this declaration on the ground that it was not signed under penalty of perjury. Defendant argues that the error was inadvertent and has submitted a corrected declaration with its reply brief.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  problems.  There, the Ninth Circuit reversed a district court finding under the ADA that the

2  employer's duty to accommodate an employee's vision problem does not extend to "commuter-

3  related limitations."  *Id.* at * 2.  The court held that "[the defendant] had a duty to accommodate

4  [plaintiff's] inability to finish her scheduled shift, even though her disability did not affect her ability

5  to function effectively as a wine steward."  *Id.*

6      Under the express provisions of the FEHA, an employer's failure to reasonably

7  accommodate a disabled individual is a violation of the statute in and of itself.  *See* Gov. Code, §

8  12940(k).  What constitutes a "reasonable accommodation" in every circumstance is not defined by

9  FEHA; however, examples provided in the statute itself and the regulations governing its

10  implementation include job restructuring, part-time or modified work schedules or "reassignment to

11  a vacant position." § 12926, subd. (n)(2); Cal.Code Regs., tit.2, § 7293.9; *see also Jensen supra,* 85

12  Cal.App.4th at 266.

13      Here,  although Plaintiff does not indicate the precise date on which she informed her

14  supervisor of her night vision problems, she states that Ms. Morales was aware of her night vision

15  problems for five months prior to her termination (from May until October 2009), that she was

16  disabled due to her lack of night vision and that she had requested a reasonable accommodation and

17  that her request was denied – other than making Plaintiff arrange for shift trades with fellow

18  employees.

19      The Court finds that there are disputed facts on the question of whether Plaintiff's employer

20  provided a reasonable accommodation.  As the decision cited by the Defendant explains:

21  "Reasonable accommodation [] envisions an exchange between employer and employee where each

22  seeks and shares information to achieve the best match between the employer's capabilities and

23  available positions.'" *Id.* at 1222 (citing  *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th

24  935, 950, 62 Cal.Rptr.2d 142).  Defendant cites no case for the proposition that an employer may

25  "accommodate" an employee's disability by requiring the employee to work out her own

26  accommodations with her co-workers on a daily or weekly basis, at a personal and possibly financial

27

28                                                    23

United States District Court

For the Northern District of California

1    cost to the employee.  Defendant's argument is based upon its version of the facts on this issue –

2    which are in dispute.  The Court cannot grant summary judgment on this claim.

3           **D.**      **Retaliation in Violation of the CFRA**

4          The analysis under a retaliation claim under CFRA[15] is similar to the analysis discussed

5    above with respect to the discrimination claims.[16]  The Court thus applies the *McDonnell Douglas*

6    burden-shifting analysis to retaliation claims.  *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028,

7    1042 (2005).

8          The Court concludes that Plaintiff has established a prima facie case of retaliation based

9    upon her request for accommodation for her medical condition or disability.  Specifically, Plaintiff

10   has put forth evidence of the temporal element, *i.e.*, the close proximity in time of Plaintiff's request

11   for a reasonable accommodation for her night vision problems and time off for her cataract surgery,

12   and the Defendant's adverse employment action.  The Court finds that this temporal evidence alone

13   suffices to establish a prima facie case of retaliation under the CFRA.  *See e.g.*, *Miller v. Fairchild*

14   *Industries, Inc.*, 797 F.2d 727 (9th Cir. 1986) ("Causation sufficient to establish a prima facie case of

15   unlawful retaliation may be inferred from the proximity in time between the protected action and the

16   allegedly retaliatory discharge.").  Under the *McDonnell Douglas* burden-shifting analysis set forth

17   above, once Plaintiff has made out a prima facie case of retaliation, the burden shifts to Defendant to

18   provide a legitimate nondiscriminatory reason for the retaliation.  In response to Plaintiff's prima

19   _____

20       [15]In 1991, the California Legislature enacted the CFRA, § 12945.2.  The CFRA, which is
21   contained within the FEHA (§ 12900 *et seq.*), "is intended to give employees an opportunity to take
     leave from work for certain personal or family medical reasons without jeopardizing job security."
22   *Nelson v. United Technologies*, 74 Cal.App.4th 597, 606 (1999).  The CFRA was modeled after the
     Federal Family Medical Leave Act 29 U.S.C. §§ 2601-2654 (FMLA) and incorporates FMLA
23   regulations to the extent that they do not conflict with federal law.  *Cross v. United Airlines*, 317
     Fed.Appx. 615, 617 (9th Cir. 2008).

24       [16]*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 261 (2001), sets forth the
     law in California with respect to the elements of a cause of action for retaliation in violation of the
25   CFRA.  *Dudley* (guided by the federal law counterpart) sets forth the elements as follows: "(1) the
     defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA
26   leave; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the
     plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of
27   her exercise of her right to CFRA leave."

28

United States District Court

For the Northern District of California

1   facie case, Defendant has provided a legitimate non-discriminatory reason for the alleged retaliation

2   – the termination of Plaintiff based upon her repeated and admitted violation of the store's coupon

3   policies –  and argues that summary judgment must be granted on the retaliation claim.

4       Plaintiff rests on the same evidence proffered in support of her prima facie case, urging the

5   Court to deny summary judgment on the retaliation claim based solely upon the timing of events.

6   The Court concludes that Plaintiff has not put forth "specific, substantial" evidence of retaliation

7   based upon her protected conduct under the CFRA in order to defeat Defendant's proffered

8   nondiscriminatory reason for the alleged retaliation.  There is no specific or substantial evidence that

9   Plaintiff was transferred to a new department and/or terminated in retaliation for having requested an

10  accommodation and leave for her medical condition or disability.  There is no direct evidence of

11  discrimination based upon disability or medical condition, such as discriminatory comments or

12  conduct having anything to do with Plaintiff's medical condition or disability.  Nor is there evidence

13  of any connection (other than temporal proximity) between Plaintiff's request for reasonable

14  accommodation and the termination of Plaintiff.  Although temporal proximity alone may suffice to

15  make out a prima facie case, the Plaintiff's burden to produce evidence that Defendant's stated

16  nondiscriminatory reason is a pretext for discrimination is a higher one.[17]

17      As discussed above, "[s] plaintiff can prove pretext either (1) indirectly, by showing that the

18  employer's proffered explanation is unworthy of credence because it is internally inconsistent or

19  otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely

20  motivated the employer."  *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 849 (9th

21  Cir. 2004) (citations omitted).  With respect to retaliation based upon medical condition or disability,

22

23      [17]The Court acknowledges that the Ninth Circuit has stated that: "To show pretext, the plaintiff
24  is not necessarily required to introduce evidence beyond that already offered to establish her prima facie
    case, although she may of course provide additional proof of the defendants' unlawful motivation."
    *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727 (9th Cir.1986).  However, in *Miller* and its progeny,
25  the evidence proffered by the plaintiff in order to make out a prima facie was considerably more
    substantial than that proffered by Plaintiff Hamed here, and consisted of more than mere temporal
26  proximity of events.  No case cited by Plaintiff has held that temporal proximity alone suffices to satisfy
    Plaintiff's ultimate burden on the issue of pretext.

27

28

**United States District Court**
For the Northern District of California

1    Plaintiff has done neither.  The only evidence in the record of pretext is timing – that Plaintiff was

2    terminated after she sought accommodation for her disability.  Where as here, the Plaintiff's

3    evidence is circumstantial, Plaintiff may only satisfy this burden by producing "specific and

4    substantial" evidence of pretext.  *See Godwin*, 150 F.3d at 1221.  Here, there is little evidence of

5    retaliation based upon Plaintiff's request for reasonable accommodation.

6           Summary adjudication on the retaliation claim based upon medical condition/disability is

7    DENIED.

8           **E.      Wrongful Termination in Violation of Public Policy**

9           Defendant asserts that it is entitled to summary judgment on Plaintiff's claims for wrongful

10   termination in violation of public policy because these claims are based on her claims under FEHA,

11   the CFRA, which Defendant asserts fail for the reasons discussed above.  Plaintiff concedes that this

12   claim rises and falls with her remaining claims.  Because Defendant is entitled to summary judgment

13   as to Plaintiff's claims as they relate to wrongful termination based on disability and national origin,

14   summary judgment on Plaintiff's violation of public policy claim is GRANTED; the motion is

15   DENIED with respect to Plaintiff's claim for wrongful termination based upon age discrimination.

16   **IV.   CONCLUSION**

17          For the reasons stated above, Defendant's Summary Judgment Motion is GRANTED IN

18   PART AND DENIED IN PART.

19          1)  Defendant's motion is GRANTED as to Plaintiff's FEHA claims based upon Plaintiff's

20   termination on account of disability and national origin discrimination;

21          2) Defendant's motion is DENIED as to Plaintiff's FEHA claim as it relates to age

22   discrimination;

23          3)  Defendant's motion is GRANTED as to Plaintiff's retaliation claim under CRFA;

24          4) Defendant's Motion is GRANTED as to the violation of public policy claim based on

25   national origin and disability; and  DENIED as to the claim based on age discrimination;

26   //

27

28                                                    26

5)  Defendant's motion is DENIED as to the claim under FEHA that Defendant failed to reasonably accommodate Plaintiff's medical condition and disability from May 2009 until her termination.

IT IS SO ORDERED.

Dated: May 11, 2011

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court

For the Northern District of California

27